443 F.2d 974
Dale C. RICHARDSON, Appellant,v.COMMUNICATIONS WORKERS OF AMERICA et al., Appellees.Dale C. RICHARDSON, Appellee,v.COMMUNICATIONS WORKERS OF AMERICA et al., Appellants.Dale C. RICHARDSON, Appellee,v.WESTERN ELECTRIC COMPANY, Inc., Appellant.
No. 20326.
No. 20329.
No. 20330.
United States Court of Appeals, Eighth Circuit.
June 4, 1971.

COPYRIGHT MATERIAL OMITTED Edith D. Hakola, Arlington, Va., Dan J. Whiteside, Omaha, Neb., for Dale C. Richardson.
Robert E. O'Connor, Omaha, Neb., for Communications Workers of America and others.
Hird Stryker, Jr., of Fraser, Stryker, Marshall & Veach, Omaha, Neb., for Western Electric Co., Inc.
Before LAY, HEANEY and BRIGHT, Circuit Judges.
LAY, Circuit Judge.

1
This case brings to us issues of both liability and damages under § 301(a) of the Labor Management Relations Act, 1947. 29 U.S.C.A. § 185(a).1 A jury returned a verdict of $20,000 in favor of Dale C. Richardson against both his former employer Western Electric Company, Inc., and the Communications Workers of America, AFL-CIO, its District 7 and its Local 7495 (hereafter Union) for breach of the existing collective bargaining agreement by reason of discrimination and wrongful discharge from employment. The complaint basically alleged violation of the collective bargaining contract wherein both the employer and the Union covenanted not to "discriminate, coerce or interfere with employees because of membership or nonmembership in the Union."2 The trial court reduced the verdict to $1,500 as the maximum recoverable due to the fact that the bargaining agreement "could have" terminated on March 20, 1967, some six and one-half months after the plaintiff's discharge.3 On appeal the plaintiff alleges error in the trial court's (1) limitation of the damages to the life of the collective bargaining contract, and (2) refusal to allow evidence of mental anguish or to submit it to the jury as an element of damage. Defendant Western Electric cross-appeals from the denial of its motion for judgment notwithstanding the verdict. The Union contends on cross-appeal that the plaintiff's action should have been dismissed for failure to exhaust contractual remedies.

2
The plaintiff, Richardson, was originally employed in Minneapolis, Minnesota, by Western Electric on July 2, 1957. After transferring to Omaha, Nebraska, in 1962 he maintained his previous membership in the Communications Workers of America, AFL-CIO. At the time of his discharge on September 1, 1966, he had reached the highest grade which an hourly employee could hold (Grade 5) and was second in seniority among the 164 hourly rated shop and warehouse employees in the Omaha plant. In 1965, Richardson became concerned over possible misuse of union funds and, getting no satisfactory explanation, he and two others withdrew from union membership in January of 1966. The withdrawal of the three left 161 employees as members of the Local. The evidence is that thereafter Richardson and the other two continuously received harassment and abuse both within the plant and outside it. Demonstrations against Richardson occurred daily in which the entire employee force took part. The record shows that obscenities were repeatedly directed at Richardson and the other two men by officers, stewards, and members of the Union. On September 1, 1966, Richardson and another employee got into an altercation. Richardson was discharged for violation of company rules.4 The evidence disclosed that, at a meeting with management, the Union had urged Richardson's discharge.

3
The court submitted special interrogatories to the jury which it answered as follows:

4
"Question Number One

5
"Do You Find from a Preponderance of the Evidence Regarding the Union's Conduct Toward the Plaintiff, from the Time He Discontinued His Union Membership, that the Union Would Have Failed to Fairly and in Good Faith Represent the Plaintiff in His Grievance Through the Steps of the Grievance Procedure, Including Arbitration, if Plaintiff had Requested the Union to do so?

6
"Yes √ No

7
"[If your answer to question number one is no, you need not proceed further]

8
"Question Number Two

9
"Do You Find from a Preponderance of the Evidence that Section 25 of the Collective Bargaining Agreement which Provides that, `Neither the Company Nor the Union Nor any of its Agents Shall in any Manner Discriminate, Coerce, or Interfere with Employees Because of * * * Nonmembership in the Union * * * Neither the Union, Nor the Members, Representatives or Agents Thereof Shall Intimidate or Coerce any Employee into Membership or Continuing Membership Therein' was Breached in Regard to the Plaintiff by:

10
[A] Western Electric Company, Incorporated

11
"Yes No √

12
[B] Communications Workers of America, AFL-CIO International Labor Organization

13
"Yes √ No

14
[C] Communications Workers of America, AFL-CIO Local 7495

15
"Yes √ No

16
"Question Number Three

17
"Do You Find from a Preponderance of the Evidence that the Plaintiff was Wrongfully Discharged in Breach of the Collective Bargaining Agreement by the Defendant, Western Electric Company, Incorporated?

18
"Yes √ No

19
"Question Number Four

20
"If so, do You Find from a Preponderance of the Evidence that the Wrongful Discharge was Proximately Caused by Actions of:

21
[A] Communications Workers of America, AFL-CIO an International Labor Organization

22
"Yes √ No

23
[B] Communications Workers of America, AFL-CIO Local 7495

24
"Yes √ No"

25
We pass first on plaintiff's claim against Western Electric.

26
It is now settled that an individual employee may, pursuant to § 301(a), litigate a claim for relief in federal court against an employer for wrongful discharge under a collective bargaining agreement. Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965); Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); Smith v. Evening News Ass'n, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). Cf. Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). Although the trial court recognized this right, it limited plaintiff's damages to the period of time from the date of discharge to the termination date of the collective bargaining agreement. Western Electric justifies such limitation in reliance, inter alia, on Rentschler v. Missouri Pac. R.R., 126 Neb. 493, 506, 253 N.W. 694, 700 (1934), which reads: "The contract between the union and the railroad company was limited to just one year, and therefore expired at the end of a year, and plaintiff could only recover for that period * * *." Federal law, however controls substantive relief under § 301. Textile Workers Union of America v. Lincoln Mills, supra, 353 U.S. at 456-457, 77 S.Ct. 912. In International Union, United Auto, etc., Workers of America v. Hoosier Cardinal Corp., 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966), the Supreme Court, discussing the applicable statute of limitations under Indiana law,5 made it clear that a § 301 suit involves consideration of both the collective bargaining agreement and the hiring contract between the employee and employer. The Supreme Court observed:

27
"Proof of the breach and of the measure of damages, however, both depend upon proof of the existence and duration of separate employment contracts between the employer and each of the aggrieved employees. Hence, this § 301 suit may fairly be characterized as one not exclusively based upon a written contract." Id. at 706, 86 S.Ct. at 1114.

28
Although the claim for wrongful discharge against the employer arises out of the bargaining agreement, it is equally clear that the terms of the agreement do not create the job and that no specific obligation to hire flows from it. As has been often recognized, the collective bargaining agreement is not an ordinary contract but rather, in a sense, agglomerates a variety of rights and methodology relating to the employer, the union, and the employees. United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 578-581, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). Cf. J. I. Case Co. v. NLRB, 321 U.S. 332, 334-335, 64 S.Ct. 576, 88 L.Ed. 762 (1944). The employment relationships which arise under it do not exist separate from it in a vacuum totally void of other relevant circumstances. The expiration date of a bargaining contract does not place the employee in jeopardy of losing his job at the termination of the agreement. In fact one of the very incentives to union representation is job security. The employee, the union which represents him, the company which employs him, each contemplate a "subsisting" contractual relationship for an indefinite period of time. Cox, The Legal Nature of Collective Bargaining Agreements, 57 Mich.L.Rev. 1 (1958). Note, 61 Column. L.Rev. 1363 (1961). This is particularly true in established industries where continual dealings with a recognized union foster renewals and renegotiations. Furthermore, the employee, the union and the company are placed on notice that even after the bargaining agreement terminates the rights and obligations of the parties continue under the umbrage of the National Labor Relations Act. The obligation of the parties to bargain for new contracts is written into law. 29 U.S.C.A. § 158(a) (5). The company cannot exercise unilateral action detrimental to fair bargaining. NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). Certain rights flowing from seniority status may not be unilaterally changed without affording the union the opportunity to bargain. Brotherhood of Locomotive Firemen and Enginemen v. Detroit & T. S. L. R.R., 421 F.2d 660 (6 Cir. 1970), cert. denied, 398 U.S. 927, 90 S.Ct. 1817, 26 L.Ed.2d 90; NLRB v. Cone Mills Corp., 373 F.2d 595 (4 Cir. 1967); Industrial Union of Marine and Shipbuilding Workers of America v. NLRB, 320 F.2d 615 (3 Cir. 1963), cert. denied, sub nom Bethlehem Steel Co. v. NLRB, 375 U.S. 984, 84 S.Ct. 516, 11 L.Ed.2d 472 (1964). The collective bargaining agreement in addition recognizes seniority rights, which as here, affect vacation pay, severance pay, pension rights and the expectancy not to be laid off during slack periods of work. It has been recognized that many of these rights may survive the termination of the agreement. See e. g. Zdanok v. Glidden Co., 288 F.2d 99 (2 Cir. 1961), aff'd, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed. 2d 671 (1962); cf. United Brick & Clay Workers of America v. International Union of District 50, United Mine Workers, 439 F.2d 311 (8 Cir., filed March 5, 1971).

29
The above discussion is germane for realization that an employee wrongfully discharged under a collective bargaining agreement, as exists here, suffers more than just the loss of a job itself. His damage must be appraised in terms of not only his wages, but the loss of seniority and the benefits which flow from it; he has thus lost his reasonable expectancy as to his continued employment. To measure this loss only to the expiration of an existing bargaining agreement fails to take into consideration the realities existing. It is true that this expectancy of continued employment might expire if the company goes out of business or if the collective bargaining agreement is not renewed with the union. But cf. Local 127, United Shoe Workers of America v. Brooks Shoe Mfg. Co., 298 F.2d 277 (3 Cir. 1962); Zdanok v. Glidden Co., supra. However, as these factors affect the employee's expectancy of work, in the present case they are even less contingent than the employee's possible contemplation of his own death or unforeseen disability. None of these considerations provide an automatic bar to a recovery for future wages beyond the termination of the bargaining agreement.

30
Federal jurisdiction under § 301 is more than a proving ground for breach of employment contracts; it is rather a statutory ground for suits brought to implement labor policy as suggested by the Labor Management Relations Act. Textile Workers Union of America v. Lincoln Mills, supra, 353 U.S. at 456-457, 77 S.Ct. 912. When an employee's expectancy of employment is challenged by invidious discrimination of the company or the union arising from his nonunion membership, the law should not react niggardly as to realization of his whole damage. As the Supreme Court has written, "there are problems so vital to the implementation of federal labor policy that they will command a high degree of inventiveness from the courts." International Union, United Auto, etc., Workers of America v. Hoosier Cardinal Corp., supra 383 U.S. at 701, 86 S.Ct. at 1111. See also Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); John Wiley & Sons v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); Textile Workers Union of America v. Lincoln Mills, supra; United Steelworkers of America v. Blaw-Knox Foundry & Mill Mach. Inc., 319 F.Supp. 636, 640 (W.D.Pa.1970); Sidney Wanzer & Sons, Inc. v. Milk Drivers Union, Local 753, 249 F.Supp. 664, 671 (N.D.Ill.1966). In view of the character of work here involved, the time the plaintiff had been with the company, the strong likelihood of his future employment with the company, the probability of renewal of the collective bargaining agreement, the severance of seniority rights, we deem future damages extending beyond the date of any collective bargaining agreement recoverable under § 301. See De Arroyo v. Sindicato de Trabajadores Packinghouse, 425 F.2d 281 (1 Cir. 1970), cert. denied, 400 U.S. 877, 91 S.Ct. 121, 27 L. Ed.2d 115; Thompson v. Brotherhood of Sleeping Car Porters, 367 F.2d 489 (4 Cir. 1966), cert. denied, 386 U.S. 960, 87 S.Ct. 1019, 18 L.Ed.2d 110 (1967); Local 127, United Shoe Workers of America v. Brooks Shoe Mfg. Co., supra. We thus conclude that it was error to limit plaintiff's damage by the expiration date of the collective bargaining agreement.

31
We move now to discussion as to the liability and damages against the Union.

32
The plaintiff pleaded and tried his case on the theory that the Union breached the collective bargaining agreement as to the nondiscrimination clause. Assertion of the claim against the Union for breach of contract misconstrues the relationship between the parties to a collective bargaining agreement. The Union is signatory to the agreement on behalf of all the employees. It thus serves in the capacity of a fiduciary to the employees. See, generally Cox, supra, 57 Mich.L.Rev. at 21. In fact, the rights of the individual employees are the "major focus" of the bargaining contract with the company. Smith v. Evening News Ass'n, supra, 371 U.S. at 200, 83 S.Ct. 267. Breach of the agreement by the bargaining agent, which simultaneously conflicts with its role as a fiduciary to the employee, creates a claim for breach of trust of its statutory duty to give adequate representation and not for one arising out of the collective bargaining contract.6 Cf. Restatement of Trusts § 192 (1935). The role of the union as a bargaining agent for all employees, including nonunion employees, is governed by the National Labor Relations Act and only incidentally by the bargaining contract with the company. Conley v. Gibson, 355 U.S. 41, 46, 78 S.Ct. 99, 2 L.Ed. 2d 80 (1957). Cf. Seay v. McDonnell Douglas Corp., 427 F.2d 996 (9 Cir. 1970). Where union discrimination against a nonunion employee ensues, the employer may choose to enjoin the union and enforce the contract clause for the sake of industrial harmony under § 301. However, when the employee seeks individual relief arising from union discrimination he need only look to the statutory duty of the union to adequately represent him. The fact that the Union's duty not to discriminate arose from its statutory duty rather than, as pleaded, from the bargaining contract should not affect plaintiff's basic claim under § 301.7 Whether the claim against the Union be described as one in tort (De Arroyo v. Sindicato de Trabajadores Packinghouse, supra) or simply as one resting on breach of trust under a statutory duty, it is clear that the action does not rest on strict principles of contract law. This fact places further emphasis on the error of restricting the damages for the wrongful discharge to the time span of the collective bargaining agreement.

33
The focal issue in a § 301 suit is the employer's noncompliance with the collective bargaining agreement and the union's complicity in that breach. Joinder of a union in a § 301 suit satisfies two basic purposes: (1) it facilitates proof in one action that the union has either refused to process this employee's grievance or that because of the union's arbitrary conduct it would have been futile to seek the union's assistance to process the grievance,8 (cf. Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965)); and (2) it allows a determination of the portion of damages, if any, that the union should bear. Vaca v. Sipes, 386 U.S. 171, 196-198, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

34
A union's liability under § 301 is only incidentally premised on invidious discrimination directed against an employee. Bad faith of the union becomes essential proof to obviate the necessity of an employee exercising the grievance machinery before seeking court relief from the company. Vaca v. Sipes, supra at 185-186, 87 S.Ct. 903. Where the union's breach of duty involves only a failure to process an employee's grievance, its apportioned damage arising from the unrelated wrongful discharge is usually de minimus. De Arroyo v. Sindicato de Trabajadores Packinghouse, supra. Cf. Waters v. Wisconsin Steel Works of International Harvester Co., 427 F.2d 476, 491 (7 Cir. 1970), cert. denied, International Harvester Co. v. Waters, 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151. Under such circumstances, the employer is solely responsible for the damages flowing from the breach of contract. As the Supreme Court said in Vaca:

35
"The governing principle, then, is to apportion liability between the employer and the union according to the damage caused by the fault of each. Thus, damages attributable solely to the employer's breach of contract should not be charged to the union, but increases if any in those damages caused by the union's refusal to process the grievance should not be charged to the employer. In this case, even if the Union had breached its duty, all or almost all of Owens' damages would still be attributable to his allegedly wrongful discharge by Swift." 386 U.S. at 197-198, 87 S.Ct. at 920.

36
However, under the above principles, where the union also wrongfully induces the discharge, it follows that its liability for damages may be apportioned to the extent that it is responsible for the whole of such damage. Cf. Vaca v. Sipes, supra at 197 n. 18, 87 S.Ct. 903; Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964).

37
In the ordinary case where the union has defaulted in its responsibility to process an employee's grievance or has wrongfully induced a breach of the collective bargaining agreement by the employer, damages for mental anguish have generally been rejected,9 but in any event would be slight compared to an employee's damage for loss of wages. We hold, at least in this instance, that the denial of damages for mental distress related to the breach of the collective bargaining agreement was proper.

38
However, the overall claim asserted here goes beyond the mere failure of the Union to process the employee's grievance with the company. As discussed, we construe plaintiff's complaint, although not artfully drawn in terms of the Union's breach of the collective bargaining agreement, as one which basically challenges the Union's role as a fiduciary in failing to adequately represent the employee. The complaint alleges, and the evidence and jury findings demonstrate, three basic violations of that duty: (1) wrongfully inducing the company to discharge the employee; (2) bad faith in failing to process the plaintiff's grievance; and (3) invidious discrimination directed against the plaintiff by reason of his nonunion membership.

39
Apropos is the Fourth Circuit's observation in the first appeal of Thompson v. Brotherhood of Sleeping Car Porters, 316 F.2d 191, 199 (4 Cir. 1963):

40
[D]isparate treatment in representation cannot be tolerated when based on the disadvantaged individual's or group's non-membership in the statutory bargaining agent. Such disparity in treatment constitutes a conspicuous example of forbidden discrimination that is not necessarily related to race. Depending upon the facts, it may violate the bargaining agent's statutory duty of fair representation. A union has no more justification to discriminate injuriously in its representation on the ground of non-membership, or instability of membership, or even because of persistent and vocal complaints or other obnoxious behavior, than it has to discriminate on account of skin pigmentation. None of these circumstances is relevant to the fair and proper discharge of a union's duty to those it is empowered to represent and whose employment is governed by its binding agreements.

41
As stated in Vaca, the duty is breached when "a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." 386 U.S. at 190, 87 S.Ct. at 916.

42
During the trial plaintiff's claim for mental anguish was dismissed without prejudice. The district court did so to permit that claim to be filed in state court.10 The district court construed the claim for mental anguish as separately pleaded and as accompanying plaintiff's § 301 claim under ancillary or pendent jurisdiction. The court stated it was dismissing the claim within its discretion to refuse to exercise pendent jurisdiction. The dismissal against the Union is challenged here.11

43
The claim against the Union for intentional discrimination, as discussed above, involves a federal right. Vaca v. Sipes, supra at 177, 87 S.Ct. 903; Ford Motor Co. v. Huffman, 345 U.S. 330, 337, 73 S.Ct. 681, 97 L.Ed. 1048 (1953); Steele v. Louisville & N. R.R., 323 U.S. 192, 198-199, 65 S.Ct. 226, 89 L.Ed. 173 (1944). This claim, as we view it, is separate and distinct from the Union's responsibility for its apportioned damage with the employer under § 301(a). There is no procedural bar to asserting this claim along with plaintiff's suit under § 301(a). In fact, litigation of all concurrent claims in one lawsuit should be encouraged. Cf. Desrosiers v. American Cyanamid Co., 377 F.2d 864, 871 (2 Cir. 1967). The damage arising from invidious discrimination against an employee by reason of his nonunion membership may often times be measured only in terms of the mental distress, anguish and humiliation caused him. The evidence is that plaintiff was subject to malicious treatment for over six months before his discharge.12

44
In measuring damage under federal law a federal court may look to both federal and state laws, "whichever better serves the policies expressed in the federal statutes." Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 240, 90 S.Ct. 400, 406, 24 L.Ed.2d 386 (1969). Mental distress has long been recognized as an element of damage for intentional wrongs in the State of Nebraska. Herbrick v. Samardick & Co., 169 Neb. 833, 101 N.W.2d 488 (1960); Doescher v. Robinson, 132 Neb. 299, 271 N.W. 784 (1937); LaSalle Extension University v. Fogarty, 126 Neb. 457, 253 N.W. 424 (1934); Netusil v. Novak, 120 Neb. 751, 235 N.W. 335 (1931); Kurpgeweit v. Kirby, 88 Neb. 72, 129 N.W. 177 (1910). Mental distress has generally been recognized to be compensable in instances arising from intentional wrongs including invasion of privacy and denial of civil rights. Time Inc. v. Hill, 385 U.S. 374, 385 n. 9, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967); Donovan v. Reinbold, 433 F.2d 738, 743 (9 Cir. 1970); Moore v. Greene, 431 F.2d 584, 590-591 (9 Cir. 1970); Rhoads v. Horvat, 270 F.Supp. 307 (D.Colo.1967); Solomon v. Pennsylvania R.R., 96 F.Supp. 709, 712 (S.D. N.Y.1951); Massachusetts Commission against Discrimination v. Franzaroli, Mass., 256 N.E.2d 311 (1970); Alcorn v. Anbro Engineering, Inc., 2 Cal.3d 493, 86 Cal.Rptr. 88, 468 P.2d 216 (1970); Duda, Damages for Mental Suffering in Discrimination Cases, 15 Clev-Mar.L.Rev. 1 (1966).13

45
Although plaintiff's claim might have been asserted in state court, we feel it was error to assume that the claim against the Union was not a federal right and not within the jurisdiction of the federal court. Since the case is to be remanded for reconsideration of damages under § 301, we deem it appropriate that plaintiff amend his complaint to separately assert his claim against the Union for mental distress arising from the intentional discrimination.14 Cf. Abrams v. Carrier Corp., 434 F.2d 1234 (2 Cir. 1970).

46
This brings us to Western Electric's cross-appeal.

47
Western Electric asserts that the jury's answer to Interrogatory No. 2(A), i. e. that Western Electric did not breach the anti-discrimination clause of the contract, defeats plaintiff's claim since this was the only breach of the contract alleged by the plaintiff. However, this overlooks that the jury found that Western Electric did wrongfully terminate Richardson's employment under the agreement. The trial court instructed:

48
"That provisions in the collective bargaining agreement did not permit the company or union to discriminate, coerce, or interfere with any employee because of his non-membership in the union or to coerce any employee into union membership and/or, in the alternative, that the collective bargaining agreement did not permit the discharge of an employee from his employment without a justified reason.

49
"That the acts or omissions of a particular defendant severally or jointly amounted to a breach of the collective bargaining agreement in one or both of the above ways."

50
Western Electric pleaded that its discharge of plaintiff was pursuant to Article 33, Sections 2 and 2.2 of the collective bargaining agreement which in essence provide for termination on serious violation of the company rules. The jury's finding under Interrogatory No. 3 that Western Electric wrongfully discharged plaintiff, unquestionably found the company's defense pretextual. We find no inconsistency in the answers to the two interrogatories. The employer's discharge of Richardson, induced by the Union's disdain for a nonunion member, was violative of the bargaining agreement even though the company was not found to be guilty of violating the non-discrimination clause. We find no merit in Western Electric's cross-appeal.

51
In summary, the cross-appeals of the Union and Western Electric are denied; we order a new trial limited solely to the damage issues as to the claim for relief under § 301. The jury is entitled to hear the evidence as to the Union's activity in inducing the plaintiff's wrongful discharge so that it may then apportion the damages between the company and the Union on the basis of their respective roles in causing the breach. See Czosek v. O'Mara, 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970); Vaca v. Sipes, supra. The damages should encompass all those elements which may have been contemplated by the parties to arise from the breach of the bargaining agreement as it affected plaintiff's employment with Western Electric. The award of damages should embrace future earnings and an evaluation of any seniority rights which plaintiff might have had and has now lost.

52
Plaintiff is to be given leave to plead against the Union, as a separate count, damages for mental distress for the alleged violation of its statutory duty to avoid intentional discrimination against him up to and including the time of his discharge.

53
Reversed and remanded.

Notes:

1
Section 185(a) reads:
"Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

2
The full clause of the contract reads:
"2. Neither the Company nor the Union or any of their agents shall in any manner discriminate, coerce or interfere with employees because of membership or non-membership in the Union. The Company shall not discriminate against any Representatives of the Union because of any action taken in presenting grievances on behalf of such employees. Neither the Union, nor the members, Representatives or Agents thereof shall intimidate or coerce any employee into membership or continuing membership therein."

3
After discharge from Western Electric, plaintiff obtained employment as a police officer. It was stipulated between the parties that the maximum compensation lost by Richardson between discharge and expiration of the collective bargaining agreement was $1,500

4
One Western Electric supervisor recommended to plaintiff that he resign rather than be discharged so he could be hired at another Western Electric plant

5
Where no federal statute of limitation exists, the federal law is that the state law then applies, 383 U.S. at 703-704, 86 S.Ct. 1107. Cf. Sandobal v. Armour and Co., 429 F.2d 249 (8 Cir. 1970)

6
As the Supreme Court recognized in Vaca v. Sipes, 386 U.S. 171, 177, 87 S. Ct. 903, 909, 17 L.Ed.2d 842 (1967):
"It is now well established that, as the exclusive bargaining representative of the employees in Owens' bargaining unit, the Union had a statutory duty fairly to represent all of those employees, both in its collective bargaining with Swift, see Ford Motor Co. v. Huffman, 345 U.S. 330, [73 S.Ct. 681, 97 L.Ed. 1048]; Syres v. Oil Workers International Union, 350 U.S. 892, [76 S.Ct. 152, 100 L.Ed. 785], and in its enforcement of the resulting collective bargaining agreement, see Humphrey v. Moore, 375 U.S. 335, [84 S. Ct. 363, 11 L.Ed.2d 370]. The statutory duty of fair representation was developed over 20 years ago in a series of cases involving alleged racial discrimination by unions certified as exclusive bargaining representatives under the Railway Labor Act, see Steele v. Louisville & N. R. Co., 323 U.S. 192, [65 S.Ct. 226, 89 L.Ed. 173]; Tunstall v. Brotherhood of Locomotive Firemen, 323 U.S. 210, [65 S.Ct. 235, 89 L.Ed. 187], and was soon extended to unions certified under the N. L. R. A., see Ford Motor Co. v. Huffman, supra. Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct. Humphrey v. Moore, 375 U.S., at 342, [84 S.Ct., at 367]." (Emphasis ours.)

7
Compare this court's analysis of the pleadings in a complicated construction damage suit, Peter Kiewit Sons' Co. v. Summit Constr. Co., 422 F.2d 242 (8 Cir. 1969), where we said:
"Indeed, there are some old cases which condemned pleadings in which alternative or inconsistent allegations or theories were so intermingled that the court was unable to determine what the plaintiff was alleging. Catanzaritti v. Bianco, 25 F.Supp. 457 (M.D.Pa.1938); see generally 2A J. Moore, Federal Practice, ¶ 8.33, at 1893 (1968 ed.). Nevertheless, though Summit's amended complaint is hardly simple, concise and direct, Summit's overlapping and duplicative allegations of breach of contract, intentional interference with a contractual relation, and quantum meruit for extra work were sufficiently clear and understandable that Kiewit was not prejudiced thereby. The number and variety of issues alone made for extensive pleadings in this case. Understandably, duplications of factual allegations ofttimes are necessary to place a series of claims in proper context." Id. at 271.

8
The jury found that the Union breached this duty by its affirmative answer in Interrogatory No. 1. This was clearly an issue of fact properly submitted to the jury. There is no merit to the Union's cross-appeal that plaintiff failed to exhaust his remedies under the collective bargaining agreement

9
De Arroyo v. Sindicato de Trabajadores Packinghouse, supra; St. Clair v. Local Union No. 515 of Intern. Broth. of Teamsters, 422 F.2d 128 (6 Cir. 1969); Brady v. Trans World Airlines, Inc., 244 F.Supp. 820 (D.Del.1965)

10
Although there may have been a cause of action against the Union (perhaps in terms of tortious interference with a contract) which could have been filed in state court, we express some concern over the duplicity of damage in that claim and the one alleged here under § 301

11
Plaintiff does not address himself to any dismissal of his claim for mental distress against the individual union members. Section 301(b) (29 U.S.C.A. § 185(b)) allows money damages to be recovered under the Act only from the Union and not from the individual members. On retrial the claim for intentional discrimination should proceed only against the Union

12
Vile and derogatory signs estimated at 1,000 in number were posted around the plant referring to "scabs"; they were taped to concrete columns, onto machinery, on the walls, in the rest rooms, etc., and drawn on supply cartons. When plaintiff or one of the two other nonunion men would enter the shop a chant of "scab! scab! scab!" to the accompaniment of foot-stomping and hand-clapping, would be raised by "everybody." Company officials claimed they were helpless to intervene since a man might just be mouthing the words and the Union would protest any unwarranted discipline. On several occasions Richardson's car was blocked in the parking lot at quitting time by union members' (one of whom was the Local's president) "stalled" cars. In one such instance the nonunion car was surrounded by some thirty union members who, chanting, jeering, and gesturing at the nonunion occupants, invited them across the street where about fifteen others waited to fight. Union officials took part in many of the intended harassments
While at work Richardson was constantly pelted by a rain of nuts, bolts, and screws thrown at him by other employees. Other methods of harassment included constant pushing and shoving, challenges to fight and threats of violence, burning Richardson with a cigarette, dropping a lighted cigarette down his back, calling his wife vulgar names and attributing to her unnatural sex acts, deflating his automobile tires, placing a beer bottle behind his tires, squeezing a tube of grease in his tool drawer, and padlocking his locker. Not long after he resigned from the Union, the tires of his car were slashed while it was parked at his home.
During the nearly seven months of his nonunion employment, union men involved Richardson in three separate fights. In May, an employee by the name of Reber entered Richardson's work area, and after calling his wife a whore, asked him to sign a statement that he (Richardson) had challenged Reber to a fight. Richardson struck Reber three times. Both were suspended by the company, Richardson for three weeks, Reber for two weeks. The Union activated a half-day wildcat strike in sympathy for Reber and filed a grievance on his behalf; none was filed for Richardson. On August 31, a union member raced ahead of Richardson to a water fountain. Richardson felt that the man was provocatively dawdling, so he removed the man's hand from the button, moved him aside, and drank from the fountain. A member of the Union standing nearby rushed to the man's side and asked him if he was hurt, to which the man replied: "Yeah, yeah, my back hurts." The next day, September 1, one Korytowski, a union member, tried to provoke Richardson in the parking lot. He kicked Richardson who returned the blow and called the offender a bastard. Later that day the company discharged Richardson.
Company officials testified as to the presence of the signs around the plant, the chanting, and the hurling of small items at the nonunion men but claimed that they were helpless to do anything about it without direct evidence from one of the supervisors. The only company intervention was a letter of warning to the Union and several oral requests to the Local's officers to settle the matter. During a meeting in the plant manager's office, the firing of Richardson was urged by the Local's president, its vice-president, its treasurer and its representative. At another union-management meeting, "concurrent" with Richardson's September 1 discharge, the Union took the position that the discharge was accurate. The Union did not file a grievance on his behalf.

13
In two cases prior to the recognition of the right of an employee to seek relief under § 301 in federal court, the Supreme Court approved the right of an employee to collect damages for mental anguish under state law. In International Ass'n of Machinists v. Gonzales, 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018 (1958), the employee had sued the union in state court for wrongful ouster from the union, seeking reinstatement and damages for lost wages and physical and mental suffering. The verdict was for the plaintiff. The union appealed contending that the action sued upon constituted an unfair labor practice and that, therefore, the sole remedy was a complaint to the National Labor Relations Board. The Court held that even though the Board was empowered to award back pay and order reinstatement it could not "mulct in damages for mental or physical suffering. And the possibility of partial relief from the Board does not, in such a case as is here presented, deprive a party of available state remedies for all damages suffered." 356 U.S. at 621, 78 S.Ct. at 925. The Court then distinguished the nature of the Board proceedings from those of the state court:
"`The state court proceedings deal with arbitrariness and misconduct vis-a-vis the individual union members and the union; the Board proceeding, looking principally to the nexus between union action and employer discrimination, examines the ouster from membership in entirely different terms.' Isaacson, Labor Relations Law: Federal versus State Jurisdiction, 42 A.B.A.J. 415, 483." 356 U.S. at 622-623, 78 S.Ct. at 926.
In a strong dissent urging the exclusion of labor cases in any form from state jurisdiction for the sake of uniformity, Chief Justice Warren implied that the Gonzales opinion brought mental damages within the scope of federal labor policy:
"The right of action for emotional disturbance, like the punitive recovery the plaintiff sought unsuccessfully in this case, is a particularly unwelcome addition to the scheme of federal remedies because of the random nature of any assessment of damages. Without a reliable gauge to which to relate their verdict, a jury may fix an amount in response to those `local procedures and attitudes toward labor controversies' from which the Garner [Garner v. Teamsters, etc., Union, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228], case sought to isolate national labor regulation. The prospect of such recoveries will inevitably exercise a regulatory effect on labor relations." Id. at 628, 78 S. Ct. at 929.
See also International Union United Auto, etc., Workers of America v. Russell, 356 U.S. 634, 641, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958).

14
Since this claim was not submitted to the jury the jury must pass anew on both liability and damages. The employer has been found innocent of violating the nondiscrimination clause of the contract and cannot in any way be responsible for this damage